Filed 12/26/14; pub. order 1/13/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | B255629 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK03329) |
| Plaintiff and Respondent, | |
| v. | |
| ROBERT M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Debra Losnick, Juvenile Court Referee. Reversed in part, affirmed in part and remanded with directions.

Eva E. Chick, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel and Sharah Vesecky, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

Cristina Gabrielidis for Minor C.M.

_____

Robert M. (father), the noncustodial and nonoffending father of C.M., appeals from the juvenile court's dispositional order granting physical custody of C.M. to the Los Angeles County Department of Children and Family Services (DCFS) for placement with maternal grandparents. Both C.M. and DCFS filed respondents' briefs in support of the order. We agree with father that there was insufficient evidence that placement with father would be detrimental to C.M. Therefore, under Welfare and Institutions Code section 361.2, subdivision (a), we reverse and remand for further proceedings.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

Mother and father were living together but not married when C.M. was born in August 2000. According to the Paternity Questionnaire completed by mother in these dependency proceedings, father provided financial support and maintained a relationship with C.M. C.M.'s half sibling, S., was born in November 2005. At all relevant times, C.M. and S. (collectively, the children) lived with mother in the maternal grandparents' home. Other maternal family members lived in the same apartment complex.

From 2004 until 2013, the children were the subject of six referrals, all of which DCFS concluded as unfounded or inconclusive. In a March 2013 interview, then 12-year-old C.M. told a social worker that mother hit her occasionally, but she could not recall any resulting marks or bruises; mother called S. fat and told her she would not get married or have babies; mother also called C.M. names, told C.M. mother never liked her and that father left them because C.M. was horrible; mother had threatened suicide; mother slept a lot when she took her medication but mother believed she did not need medication because there was nothing wrong with her. C.M. told the social worker that she saw father on weekends and things were better there, but she did not want to live with him. Mother and the maternal grandparents denied that mother had any mental health issues.

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code. Section 361.2, subdivision (a) is hereafter referred to as section 361.2(a).

S.'s absence from school for 50 days prompted another referral in May 2013, which resulted in mother agreeing to a voluntary maintenance plan in July 2013. C.M. continued to have regular contact with father and his wife (stepmother), including frequent telephone calls and unmonitored overnight visits for Thanksgiving and Christmas, which C.M. said she enjoyed. C.M.'s therapist encouraged these contacts.

On January 9, 2014, mother was arrested following an incident in which she pushed maternal grandmother to the ground causing her to lose consciousness; mother next threw a vase at a cousin; the vase hit that cousin's mother (maternal aunt) causing injuries which required surgery to repair severed tendons. DCFS did not learn about the incident until two weeks later, after a family maintenance worker was unable to make contact with mother. When asked about what happened, maternal grandmother was evasive. Various family members gave different versions of what occurred. C.M. denied she was present during the altercation.

DCFS filed a petition which alleged the children were persons described by section 300, subdivisions (a) and (b) as the result of the January 9 altercation which C.M. witnessed (paragraphs a-1 and b-1). There were no allegations against father. Following a Team Decision Meeting on January 30, it was agreed that the children would be detained from mother (who was still incarcerated) and temporarily placed with maternal grandparents, notwithstanding DCFS's concerns that the maternal grandparents were in denial about mother's problems.[2]

According to the detention report, a "teary-eyed" C.M. told the social worker that she was not home when the altercation occurred, but was home by the time mother was being taken to jail. C.M. said, "Now that she's in jail, hopefully she can get the help she needs. I don't know how to explain this. But my mom can get very nervous. Sometimes she'll pull out her hair. There's a bunch of hair in a shoe box under her bed. Or when she takes me and [S.] to the mall, she'll start picking her face . . . ." When told of the altercation, father said: "I knew something like this would happen. That's why when I

---

[2] Father was not present at the meeting because he had to work, but stepmother was there.

go over there to pick up [C.M.], I don't want any dealing with [mother]. She needs a lot of help. I've wanted custody of [C.M.] for a long time." Father said he and stepmother were also willing to have S. live with them. Father had noticed a recent negative change in C.M.'s attitude, which he attributed to the influence of the maternal relatives.

Father appeared at the detention hearing on February 4, 2014, and requested that C.M. be released to him. C.M. wanted to continue living with maternal grandparents, but was not opposed to overnight visits with father. DCFS opposed releasing C.M. to father. Observing that DCFS's report focused on mother, the juvenile court concluded that it did not have enough information about father to give him custody of C.M. It vested temporary custody and placement of the children in DCFS, pending further orders. Father was given reasonable unmonitored visits with C.M. and DCFS was given discretion to allow father overnight visits with C.M.'s consent. The matter was continued to March 21, 2014, for adjudication and disposition.

On March 3, 2014, the children's counsel filed a Walk On Request seeking an order that C.M. "not be released to father without court hearing with full report from DCFS and notice to parties in advance." The request states that C.M. "is terrified of being released to her father . . . ('nonoffending' under the petition). [C.M.] informed the court at the detention hearing on 2-4-14, that her father 'missed 11 years' of her life. There is no order for CSW discretion to release, but CSW is to evaluate placement with [father.]" The juvenile granted the request and ordered: "[C.M.] is not to be released to father without prior court order, and a full report is to be filed to the court in advance."

According to the Jurisdiction/Disposition Report, the maternal grandparents continued to deny that mother pushed maternal grandmother on January 9th. They did not "acknowledge their daughter has mental health issues and how they impact the children's well being." The social worker had been unable to make contact with father. C.M. wanted unmonitored bi-monthly weekend visits with father, but did not want to live with him: "I don't want to live at a new home, I have never lived with him before and I don't want to change schools. I have only lived here [with maternal grandparents] and my grandma has always taken good care of me." Noting that both fathers were

4

nonoffending, the report states: "[T]the fact remains there have been issues of domestic violence in the past between mother and each father. [C.M.'s father] has been reported to be an alcoholic and in fact has been arrested on 2 occasions for inflicting corporal injury on spouse.[3] . . . Furthermore, while the father has an 'odd' work schedule and travels for days at a time, if [C.M.] was released to him, [she] would hardly spend time with [him]." The report concludes: "releasing the children to their respective fathers would create more emotional harm to the children and the siblings would be separated. Furthermore, the children have never lived in a different home and have been raised primarily by the maternal grandparents. Therefore, it is respectfully recommended that the children remain placed with the maternal grandparents since it is not in their best interest to be released to their respective fathers. It is recommended the fathers have unmonitored overnight visits with their children and that a visitation schedule be made in order not to interfere with the children's school and weekend extra-curricular activities."

At the March 21, 2014 hearing, father submitted on the petition, which included no allegations against him. The children's counsel stated: "[The children] indicate in the jurisdiction report that they denied ever seeing their mother use drugs, act bizarre, and they do not know about the incidents that occurred resulting in the police report that the court has before it [of the January 9 altercation]. [¶] My clients are supportive of the mom, find themselves in a very difficult position today and would prefer that I do not argue anything against the mother. So at this point I am going to submit to the court and ask the court to carefully review all of the evidence. . . ." The juvenile court sustained the section 300 petition.

Following adjudication, the juvenile court proceeded immediately to disposition. C.M. remained "adamant that she does not wish to reside with her father. She is beyond uncomfortable." Even so, father wanted custody of C.M. Father "has attempted throughout [C.M.]'s life to see her and to be a part of her life but has been prevented from doing so by mother and also by maternal grandmother. [¶] . . . Father's main concern for

3    Father had a 1994 conviction for a domestic violence-related offense and a misdemeanor domestic violence arrest which was dismissed.

5

[C.M.] remaining with maternal grandmother is that she will continue to act to protect mother and not protect the children." Although no one at the hearing referred specifically to section 361.2(a), father argued that C.M.'s reluctance to change schools and leave the maternal grandmother's home did not "rise to the level of clear and convincing evidence required or for the court to make a finding of detriment . . . ." If the juvenile court was not inclined to give father immediate custody of C.M., the alternative father requested was a "home of parent – father" order, conditioned on C.M. remaining in the maternal grandparents' home. Father expressed concern that, if C.M. remained suitably placed with maternal grandparents and mother failed to reunify, father would be disadvantaged at any future permanent placement plan hearing.

The juvenile court found it would be detrimental to place C.M. with father, in a home in which she had never lived. The court explained: "I don't think [C.M.] is comfortable with her father because he's not been in her life for whatever reason. The reason doesn't matter. But the more time she spends with him, the more acclimated she gets, the more comfortable she gets, the more time that she will want to spend with her father is my belief, and the court is going to make a visitation schedule to allow that to happen. [¶] . . . [T]o just move her from everything she has ever known is not going to work, and it is going to detrimentally impact the child. So I am not prepared to do that." The juvenile court did not state that it was making the detriment finding under section 361.2(a), or under the clear and convincing standard required by that statute, nor does the minute order so state. The juvenile court took custody of both children from mother and both fathers and placed them with DCFS for suitable placement. Father was given unmonitored visits with C.M., including overnight and weekends; DCFS was given discretion to liberalize those visits. Father was not ordered to participate in any services. Father timely appealed.

## DISCUSSION

Father's challenge to the disposition order is two-fold: (1) the detriment finding was not expressly made pursuant to section 361.2(a) or under the clear and convincing

6

standard; and (2) there was insufficient evidence of detriment.  We begin with a brief discussion of the governing statute, section 361.2(a).  We next turn to the sufficiency of the evidence to support the juvenile court's finding of detriment.  Finding insufficient evidence to support the detriment finding, we reverse the dispositional order and remand for a new dispositional hearing.

A.     *Section 361.2(a)*

" 'A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood.' [Citation.]" (*In re Abram L.* (2013) 219 Cal.App.4th 452, 460-461 (*Abram L.*).)  A nonoffending parent has a constitutionally protected interest in assuming physical custody of his or her dependent child which may not be disturbed "in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child' " (*Ibid*.)

The rights of a noncustodial and nonoffending parent to custody of a dependent child are governed by section 361.2(a), which provides:

> "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  *If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child*."  (Italics added.)

The statute "evinces the legislative preference for placement with the noncustodial parent when safe for the child.  [Citation.]" (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)  It requires placement with a noncustodial, nonoffending parent who requests custody "unless the placement would be detrimental to the child." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422 (*Luke M.*).)

7

To comport with due process, the detriment finding must be made under the clear and convincing evidence standard. (*Abram L., supra*, 219 Cal.App.4th at p. 461; *Patrick S., supra*, 218 Cal.App.4th at p. 1262; *In re John M.* (2006) 141 Cal.App.4th 1564, 1569 (*John M.*); *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1828-1829 (*Marquis D.*).) Clear and convincing evidence requires "a high degree of probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]" (*Patrick S.,* at p. 262; *Luke M., supra*, 107 Cal.App.4th at p. 1426.) The court in *Marquis D., supra*, explained the higher standard of proof as follows:

> "[T]he trial court's decision at the dispositional stage is critical to all further proceedings. Should the court fail to place the child with the noncustodial parent, the stage is set for the court to ultimately terminate parental rights. At all later review hearings, the court may deny return of the child to the parent's physical custody based on a finding supported only by a preponderance of the evidence that return would create a substantial risk of detriment to the child's physical or emotional well-being. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) [¶] If a preponderance of the evidence standard of proof is applied to deny initial placement with the noncustodial parent, that parent may have his or her parental rights terminated without the question of possible detriment engendered by that parent ever being subjected to a heightened level of scrutiny. Moreover, applying a clear and convincing standard of proof to remove custody from the custodial parent while denying placement with the noncustodial parent based on a preponderance of the evidence would lead to the anomalous result that a parent who had no connection with the circumstances that brought the child within the jurisdiction of the court could have his or her rights terminated upon a lesser showing than the parent who created those circumstances." (*Marquis, D., supra,* 38 Cal.App.4th at p. 1829.)

The nonoffending parent does not have to prove lack of detriment. Rather, the party opposing placement with a nonoffending parent has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody. (*In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1256.)

8

*B.*      *There Was Insufficient Evidence that Placement With Father Would be*
          *Detrimental to C.M.'s Physical or Emotional Well-Being*

Father contends the disposition order is not supported by substantial evidence that placing C.M. with him would be detrimental to her safety, protection or physical or emotional well-being. DCFS (joined by C.M.) counters that the following evidence was sufficient to support a finding of detriment under the clear and convincing evidence standard: C.M. wanted to remain with maternal grandparents; she wanted to visit but did not want to live with father; she did not want to be separated from S. or change schools; father worked long hours and was often away from home, as a result of which C.M. would often be in the care of her stepmother; although he was nonoffending, father had a history of alcohol abuse (as reported by mother) and domestic violence (one 1994 conviction and a dismissed misdemeanor arrest). Viewing the evidence under the substantial evidence standard of review (*John M.,* 141 Cal.App.4th at pp. 1569-1570; *Patrick S., supra*, 218 Cal.App.4th at p. 262), we conclude the order was not supported by substantial evidence of detriment.

While the child's wishes, sibling bonds and the child's relationship with the noncustodial parent may be considered by the juvenile court in determining whether placement of a dependent child with a noncustodial, nonoffending parent would be detrimental to the child's physical or emotional well-being, none of these factors is determinative. (*Abram L., supra*, 219 Cal.App.4th at pp. 460-461 [wishes of 14- and 15-year-old brothers and alleged lack of relationship between children and noncustodial parent not sufficient]; *John M., supra*, 141 Cal.App.4th at p. 1570 [14-year-old child's wishes not sufficient]; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 [sibling relationships not sufficient]; but see *Luke M., supra,* 107 Cal.App.4th at pp. 1425-1426 [wishes of 10 and eight-year-old and unusual bond with half siblings sufficient to support detriment finding].) Expert opinion is helpful, but not essential. (*Luke M.,* at p. 1427.)

For example, in *John M., supra*, 141 Cal.App.4th 1564, John (13 years old) and his 10-month-old half sister, were detained and placed with the maternal grandmother after the mother physically abused John. John's father, who lived in Tennessee, wanted

9

custody of John, with whom he had been in telephone contact for a year after a four-year hiatus; John wanted to live with a maternal aunt. The juvenile court declined to place John with the father because there had been little contact between them, John did not want to move to Tennessee, the father's out-of-state location made him "an unknown entity," there was a reunification plan for the mother, and services would be necessary to ensure John's safety and the success of a placement with father. The appellate court reversed, finding these factors were not sufficient to support a finding of detriment under section 361.2(a). (*Id*. at pp. 1570-1571.)

In *Patrick S.*, *supra*, 218 Cal.App.4th at page 1262, the court stated that *John M.* "stands for the principle that where a child has a fit parent who is willing to assume custody, there is no need for state involvement unless placement with that parent would create a substantial risk of detriment to the child. (§ 361.2, subd. (a).) When the parent is competent, the standard of detriment is very high. [Citation.]" In *Patrick S.*, the juvenile court's finding that placement of the 13-year-old child with his father in Washington State would create a substantial risk of detriment was based on "the totality of circumstances, including [the child's] wishes, anxiety about moving to his father's home, need for continued therapeutic services, the lack of an established relationship with his father and stepmother, father's scheduled [military] deployments and his plan to home school [the child], and the lack of available child welfare services in father's home state." The *Patrick S.* court found these factors did not constitute substantial evidence of detriment. (*Ibid*.) Regarding the long military deployments, the court found no detriment because the stepmother was available to care for the child. (*Ibid*.)

Under *John M.* and *Patrick S.*, neither C.M.'s understandable wish to remain with the maternal grandparents in the only home she had ever known, nor the alleged lack of an established relationship with father, were sufficient to constitute substantial evidence of the high level of detriment required under section 361.2(a). Likewise, the bond between C.M. and S., and the fact that C.M. would be in stepmother's care much of the time because of father's work schedule, were equally insufficient.

10

Father's 1994 conviction for domestic violence and mother's unsubstantiated claim that father abused alcohol do not change our analysis, especially since neither formed the basis of jurisdiction. (*Abram L., supra*, 219 Cal.App.4th at p. 464 [finding of detriment was not supported by allegations of father's unresolved alcohol problem and history of substance abuse where the juvenile court dismissed those allegations from the petition and there was no evidence the father used illicit drugs or drank an inappropriate amount of alcohol at any time after the dependency proceedings commenced].) Not only did the petition in this case not include any allegations of substance abuse or domestic violence against father, there was no evidence of any recent, much less current, domestic violence by father, and mother's mental health issues made her a questionable reporter on the issue of father's alcohol use.

DCFS's reliance on *Luke M., supra*, 107 Cal.App.4th 1412, for a contrary result is misplaced. In that case, a noncustodial, nonoffending father challenged the order placing his 10-year-old and eight-year-old children with maternal relatives, rather than with him in Ohio. The appellate court affirmed the order based on a finding that moving the children to Ohio would be detrimental to their well-being because of the unusually strong bond they had with their half siblings. (*Id.* at pp. 1418-1419.) The appellate court found substantial evidence that moving to Ohio would have a devastating emotional impact on the children, including the emotional testimony of one of the children. (*Id.* at pp. 1426-1428.) Here, the evidence of detriment from separating C.M. and S. was nowhere near as strong as that in *Luke M.* First, C.M. was not being moved half way across the country, as were the children in *Luke M.* Second, there was no evidence that the bond between C.M. and S. was any greater than the normal sibling bond, in contrast to *Luke M.* where the relationship among the siblings "was much closer than in normal sibling relationships." (*Id.* at p. 1427.) Finally we observe that father offered to have S. live in his home, and there was nothing to suggest he would not foster an ongoing relationship between siblings.

In light of our conclusion that there was insufficient evidence of detriment to support the order placing C.M. with maternal grandmother rather than father, we need not

11

consider father's second contention, that the juvenile court prejudicially erred by not expressly stating that it was making the detriment finding under the clear and convincing standard set forth in section 361.2.

Our conclusion that the March 21, 2014 disposition order was not supported by substantial evidence is based on the facts extant on the day of the hearing, which we have determined from the record on appeal. At the dispositional hearing following our remand, the juvenile court may, of course, take into account circumstances and events that have taken place subsequent to the March 21 hearing.

## DISPOSITION

The detriment finding is reversed and the matter is remanded to the juvenile court with directions to hold a new dispositional hearing on the issue of placement of C.M. with father under section 361.2(a). On remand, the court may consider new evidence or changed circumstances that may have occurred during the pendency of this appeal. In all other respects, the jurisdictional and dispositional findings and orders are affirmed.


                                                        RUBIN, J.
WE CONCUR:



            BIGELOW, P. J.



            FLIER, J.


12

Filed 1/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | B255629 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT M.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK03329)<br><br><br>**ORDER FOR PUBLICATION OF OPINION** |

IT IS HEREBY ORDERED that the opinion filed in the above matter on December 26, 2014, is certified for publication with no change in the judgment.

_____

BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.